*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

MATTHEW RYAN GRANT,

      Defendant-Appellant.

UNPUBLISHED
November 26, 2019

No. 338615
Wayne Circuit Court
LC No. 16-007093-01-FC

Before: CAMERON, P.J., and CAVANAGH and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals his jury trial convictions of two counts of assault with intent to commit murder (AWIM), MCL 750.83, two counts of assault with a dangerous weapon (felonious assault), MCL 750.34, discharge of a firearm from a vehicle, MCL 750.234a, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to prison terms of 11 to 20 years for his AWIM convictions, 2 to 4 years for his felonious assault convictions, 1 to 10 years for his discharge of a firearm from a vehicle conviction, and a consecutive 2-year term of imprisonment for his felony-firearm conviction. We affirm.

## I. BACKGROUND

The evidence at trial established that HW, then 17 years old, and defendant met on MeetMe, a dating application. Defendant offered HW $1,000 in exchange for sex. Specifically, HW was to introduce defendant to her friend, and they were all to engage in a "threesome." Defendant and HW met at a Del Taco parking lot where he gave her the money. From there, their accounts diverge.

HW testified that she told defendant that they would hang out later when her friend got off work. She left the parking lot and proceeded to pick up her boyfriend, Muhammad Adbuljami. While driving, HW noticed defendant's vehicle in her rear-view mirror but initially did not think much of it. When HW reached an intersection, her vehicle stalled and she stopped at a gas station; defendant pulled up next to her vehicle. HW testified that defendant exited his vehicle and came "charging" at the driver's side of her vehicle. HW, who was scared, started her

vehicle, and pulled out of the gas station. Defendant returned to his vehicle and followed HW as she wove in and out of traffic, speeding. Eventually, defendant pulled up to the passenger side of HW's vehicle and fired shots—two hit her vehicle, one hit her right shoulder, and one hit her neck. Adbuljami testified consistently with HW; they both identified defendant as the shooter.

According to defendant, HW told him to follow her after the cash exchange. He testified that he did so for a while, but he lost track of her when she ran a red light. He then returned home.

Initially, HW was not forthcoming with the police about her prior involvement with the shooter. She eventually told Redford Police Detective Sergeant Kevin Crittenden "[t]he truth." Officers executed a search warrant on defendant's home and .38 caliber bullets were seized from the vehicle he drove the night of the shooting. A loaded .38 caliber gun was seized from another vehicle belonging to defendant. A bullet was recovered from HW's vehicle, and State Police Sergeant Dean Molnar, an expert in firearm tool marks, classified the fired bullet as being in the .38/9mm caliber class.

After sentencing, defendant filed a motion for a new trial, claiming ineffective assistance of counsel. The trial court denied the motion.

## II. ANALYSIS

Defendant argues that the trial court erred in denying his motion for a new trial. We disagree.[1]

"To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *People v Riley (After Remand)*, 468 Mich 135, 140; 659 NW2d 611 (2003). A trial counsel's performance is deficient if "it fell below an objective standard of reasonableness under prevailing professional norms." *Id*. To show prejudice, "the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

---

[1] We review a trial court's decision to deny a motion for a new trial for an abuse of discretion. See *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008). "An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes." *People v Sharpe*, 502 Mich 313, 324; 918 NW2d 504 (2018). "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The trial court's findings of fact are reviewed for clear error, and questions of constitutional law are reviewed de novo. *Id*.

Defendant first argues that defense counsel was ineffective for failing to consult or present his own ballistic expert. However, he fails to establish that his proposed ballistics expert would have provided him a substantial defense.

An attorney's decision whether to retain or call witnesses, including expert witnesses, is a matter of trial strategy. *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). In general, the failure to call a witness can constitute ineffective assistance of counsel only when it "deprives the defendant of a substantial defense." *People v Hoyt*, 185 Mich App 531, 537-538; 462 NW2d 793 (1990). "A substantial defense is one that might have made a difference in the outcome of the trial." *People v Chapo*, 283 Mich App 360, 370; 770 NW2d 68 (2009) (quotation marks and citation omitted).

Sergeant Molnar classified the markings on the bullet recovered from HW's vehicle as consistent with being fired from a .38/9 mm caliber gun. Molnar fired test bullets from defendant's .38 caliber gun for comparison purposes. But the results were "inconclusive," meaning that Molnar could not match or eliminate defendant's gun as the one that fired the bullet recovered from HW's vehicle. Molnar explained that "with some firearms and sometimes older firearms, they just don't mark that well, the rifling and the individual marks inside of the barrel don't transfer over for lack of a better term, on to the bullet surface itself. So the marks were not there."

Defendant's claim of ineffective assistance of counsel is premised on a ballistics investigation report authored by Steven Howard. Howard inspected defendant's firearm, but there are no indications that he performed any tests. Instead, Howard provides his general opinion that the gun was in good condition and there was no reason why it should have produced "clean" test bullets. He also notes that there are many possible weapons in existence that could have produced the markings found on the fired bullet.

Even assuming that Howard is qualified to testify about firearm markings, we fail to see how his opinion would have substantially aided the defense. Howard maintains that, if defendant's gun fired the shots at HW, then the marking on tests bullets should have matched the fired bullet. But he does not cite any evidence or support for that conclusion. Further, he concedes that the lack of matching marks between the bullets does not eliminate defendant's gun. So, ultimately, Howard and Molnar arrive at the same place: the test results in this case were inconclusive.

Howard nonetheless opines that it was misleading for Molnar to tell the jury that he could not eliminate defendant's weapon given the vast number of guns in existence that could have produced the markings found on the fired bullet. However, defense counsel established on cross-examination that the bullet could have been fired from a range of guns. For instance, counsel asked Molnar, "Now you would agree that a .38 Special, there are many, many, many, of those weapons in the public, in the country?" Sergeant Molnar responded, "Yes." Counsel then asked, "And you would agree that there is more than one manufacturer other than Charter Arms that manufactures a .38 Special, correct?" Sergeant Molnar responded, "Yes, sir." Counsel also asked, "So we have established that this bullet could have been fired from a 9 millimeters [sic] weapon or a 357 weapon. That you're positive, right?" Sergeant Molnar responded, "Yes, they

are all in the 38 caliber class." Thus, while an exact number of possible firearms were not presented to the jury, counsel adequately made the point that Howard emphasizes in his report.

Defendant also contends that "[t]he spent bullet may not have been a 38/9[.]" However, defendant's contention is merely speculation as Howard does not dispute that the bullet was in the .38/9mm caliber class. Rather, he merely noted the slim difference of diameters between bullets within that class.

In sum, Molnar testified that the test results were inconclusive, and Howard concedes that testing could not have eliminated defendant's gun. Further, this case was about *who* fired the shots at HW's vehicle. And there was ample evidence presented to the jury that defendant was the shooter. Accordingly, defendant fails to show that Howard's proposed testimony would have affected the outcome at trial.

Next, defendant argues that defense counsel was ineffective for failing to consult or present his own forensic cell expert. Again, defendant fails to establish that he was denied a substantial defense.

Detective Sergeant Crittenden testified that he received certified records for defendant's and HW's cell phones. Based on the records, Crittenden compiled a cell phone map for the night in question showing defendant's and HW's respective locations. For defendant, Crittenden used the Network Event Location System (NELOS), which provides "an approximate location" for a cell phone receiving service from ATT. Crittenden testified that "NELOS is not GPS within feet. NELOS is an approximation of the [cell phone]." Accordingly, he could only give an approximation of defendant's location. Crittenden concluded that at about 9:44 p.m.—shortly before the estimated time of the shooting—defendant's and HW's phones were in the same general area.

Defendant's proposed expert, Spencer McIanville, emphasizes in his report that NELOS does provide exact GPS locations. As discussed, Crittenden made this same point to the jury at trial. Defense counsel also cross-examined Crittenden about the radius of the approximate locations on the map before aptly concluding: "All this pure mapping does is just show Mr. Grant coming down to the area, being in the area for a while and going back up, right?" Critten responded affirmatively.

McIanville nonetheless takes issue with Crittenden's methodology and asserts that he failed to accurately explain to the jury the size of the approximate areas shown on the map. He also asserts that it was "pure speculation" for Crittenden to make claims about the vehicles traveling on particular roads. However, McIanville does not expressly disagree with Crittenden's conclusion that defendant and HW were in the same general area at 9:44 p.m. on the night of the shooting. Indeed, that was undisputed at trial because defendant testified to meeting up with HW and following her in the time leading up to the shooting. Thus, defendant fails to establish that a competing expert attacking Crittenden's methodology and approximations would have made a difference at trial.

Finally, defendant argues that defense counsel failed to adequately impeach key prosecution witnesses.

"Counsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). "Decisions regarding whether to call or question a witness are presumed to be matters of trial strategy." *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015).

HW admitted at trial that she used MeetMe to communicate with men besides defendant and that she had offered to perform various sex acts for those men in exchange for money. She testified that she did not to follow through with these offers—she said these things in order to get money. She also said that defendant was the only person from MeetMe that she met in person. During cross-examination, defense counsel used a 185-page document of MeetMe conversations to question HW about her conversations with other men. HW admitted to telling various untruths about her personal life to people in these messages.

Defendant maintains that there were "missed opportunities" to impeach HW with the MeetMe messages. Specifically, defendant highlights that HW proposed on multiple occasions to meet at Del Taco to exchange cash after which the man would follow HW to her home. Defendant asserts that these messages would have illustrated to the jury that HW "likely had many jilted and angry paramours." He also contends that the message would have corroborated his testimony that HW told him to follow her after the cash exchange.

It must be noted that these message do not establish that HW actually met with anyone else from MeetMe. She was simply proposing terms; defendant does not point to any message showing that a meeting with someone besides defendant occurred. That said, the messages would have at least supported defendant's testimony that HW told him to follow her.

Even assuming that it was objectively unreasonable for counsel not to question HW about those messages, defendant fails to explains how this line of questioning would have, more likely than not, led to a different outcome at trial. First, the jury may have believed defendant's testimony that HW told him to follow her. The key issue at trial was what transpired *after* defendant began following her. Second, defendant argues that the messages would have shown the jury that there were possibly other men with a motive to commit these crimes. But there was substantial evidence that defendant was the perpetrator. It was undisputed that defendant was following HW in the time leading up to the shooting. And the jury plainly found credible HW and Adbuljami's testimony identifying defendant as the shooter. The .38 caliber ammunition found in defendant's vehicle provided supporting circumstantial evidence. Given all of this, there is not a reasonable probability that further exploration of the MeetMe messages would have led to a different outcome at trial.

Defendant identifies some alleged inconsistences in HW and Adbuljami's testimony that involve minor or insignificant details. Defendant argues that HW's testimony that she and defendant parted amicably with plans to meet later for a threesome is inconsistent with her testimony that defendant later pulled up next to her at a gas station and angrily charged her vehicle. It cannot be definitively said what motivated defendant's actions. He may have realized he was being defrauded, or he may have been angered by HW picking up her boyfriend. In any event, the critical question was not why defendant was upset, but what he did thereafter.

The second alleged inconsistency is that HW testified that defendant parked beside them at the gas station while Adbuljami testified that the vehicle parked behind them. Defendant does not explain how highlighting this minor inconsistency would have aided his defense. The mere fact that trial counsel did not cross-examine the witnesses on all contradictory aspects of their testimony and prior statements does not constitute ineffective assistance of counsel. See *People v McFadden*, 159 Mich App 796, 800; 407 NW2d 78 (1987). The same can be said for the third alleged inconsistency, which is that Adbuljami testified that he rolled down his window when they were stalled at the intersection, but a police officer testified that HW's passenger window was busted and the rear passenger window was rolled down.

Affirmed.

/s/ Thomas C. Cameron
/s/ Mark J. Cavanagh
/s/ Douglas B. Shapiro